IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 2:05P00119 |
| | ) | 2:05P00120 |
| JUSTIN JONES | ) | |

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO ACQUIT**

I. The Undisputed Facts

The undisputed facts are these:

1.   The stop and the arrest made by the Park Rangers occurred in the state of Tennessee 8/10 of a mile from the bottom of the exit ramp where route 58 connects with route 25 E. South.

2.   The distance from the overhead walkway near LMU and the entrance to LMU where the stop took place is 2/10 of a mile, which is 1,056 feet, the length of 3 ½ football fields.

1

3. The Rangers did not turn on the blue lights until after passing under the walkway.

4. As soon as the Park Rangers turned on the blue lights Justin Jones pulled his vehicle over and stopped.

5. Justin Jones stopped at the entrance to LMU, the place where he turned into having gotten off the roadway.

6. Justin Jones did not see the Park Rangers vehicle much less the blue lights until after Justin Jones had driven his vehicle under and past the walkway.

7. Between passing under the walkway and the time when Justin Jones saw the blue lights and pulled off the road in front of LMU, Justin Jones remembers passing on the left a car on his right and then passing on the right a car on his left.  It is after passing these two vehicles on the straight- of- way road between the walkway and the LMU entrance that Justin Jones saw the blue lights at which sighting of the blue lights Justin Jones brings his vehicle to a stop in front of LMU.

8. Only one of the two Rangers in the Ranger vehicle appeared at the trial.

9. Ranger Brien Chartier (herein after Chartier) told Justin Jones later at the Middlesboro , Kentucky Police Department he had passed all of the elements of the field sobriety test with the exception of the field breathalyzer. (Chartier did not recall whether he had made this statement or not, but could not deny the statement. Justin Jones was clear and unequivocal that the statement was made.)

10. The allegation of speeding 60 m.p.h. was not clocked by radar. Radar was available but not used.

11. The officers made no determination of the speed of the Justin Jones vehicle along Route 58 prior to Justin Jones entry into Route 25 E. South.

12. Though the distance between the entrance to 25 E. South at the exit ramp and the walkway was ½ mile (2,640 feet or close to 9 football fields in length), no where along this stretch of road did the Park

Rangers turn on their lights and attempt to pull over Justin Jones for a stop and arrest. No explanation was given why the blue lights were not turned on until after Justin Jones' vehicle had passed under the walkway.

13. Chartier did not retake the stand after the evidence of fellow Park Ranger Wiley as to where the geographical boundary line crossed Route 23 E. South.

14. Chartier did state that he and the other officer in the Ranger vehicle did pace the Justin Jones vehicle both within and without the boundary of the Park. He did not testify as to whether he and his fellow officer began the process of pacing the Justin Jones vehicle within the geographical boundary of the Park or whether it was within the jurisdictional boundary of the park. More importantly, Chartier did not testify as to whether the pacing of the Justin Jones vehicle showed a 60 m.p.h. speed limit while the pacing was being conducted within the park or whether the 60 m.p.h. limit was only observed during the pacing which began outside the geographical limit, the boundary of the park.

15. Chartier did not testify where along Route 23 E. he observed Justin Jones passing and weaving in and out of traffic.

16. Chartier admits that Justin Jones was not weaving or passing outside the passing lanes.

17. The testimony of Chartier was not that Justin Jones was weaving erratically in and out of the lanes but that he was weaving as he was passing other vehicles.

18. The Government put on no evidence that the alleged offenses were not being investigated by another Federal Law Enforcement Agency having investigative jurisdiction over the offenses, a requirement for 16 U. S. C. § 1a6(6)(3) to apply.

19. The preliminary breath test occurred in Tennessee and the breathalyzer test occurred in Kentucky.  Neither took place inside the Park.

20. The portion of Route 25E (South) between the intersection of Route

58/25E and the LMU entrance is in the State of Tennessee.

21. Chartier was not a Tennessee or Kentucky law enforcement officer.

## II. The Disputed Facts

The Disputed Facts are These:

1. Chartier says he turned on the blue lights right at or just after the walkway. Justin Jones said the blue lights came on after the walkway and after Justin Jones had passed two cars between the walkway and LMU.

2. Park Ranger Wiley stated it was his understanding that the geographical boundary of the park extended a short distance into 25 E. South and that the jurisdictional limit (for law enforcement purposes) limit extended a somewhat further distance south along 25 E. South. But the two map exhibits of Justin Jones did not support the testimony of Park Ranger Wiley. The photograph of a map from the Cumberland Gap National Park Visitors Center shows that everything

6

    south of the intersection of Route 58 and 25 E. is outside (south of) the boundary of the park and within the State of Tennessee. The boundary of the state of Tennessee takes a triangular shape as it fits between the park boundary on the left and the right. The apex of that triangle is the intersection of Route 58 and Route 25 E. South.

3.     Chartier says he was driving the ranger vehicle. Justin Jones says that the other officer not Chartier was driving the Ranger vehicle. Justin Jones states that he saw the Officers getting out of the Park Ranger vehicle behind him and saw Chartier getting out of the passenger side. Justin Jones also stated that though this occurred around midnight there is lighting at the LMU campus entrance(a fact not disputed).

### III. The Law

1.     The Park Rangers have no jurisdiction to stop or arrest a person for an offense that did not occur in the geographical confines of the Cumberland Gap National Park. Park Rangers can make an arrest outside the park without a warrant for an offense committed in his or

her presence inside the park if the person arrested outside the park is fleeing the park in order to avoid the arrest for the conduct which occurred in the officers presence inside the park.  16 U.S.C. § 1a-6(b)(1); U.S. v. Fox 147 F. Supp.2d 1008 (N. D. Cal., 2001).  (A case where as defendant's car approached an officer using a radar gun. The officer clocked the defendant as traveling well in excess of the posted speed limit. The officer then signaled the defendant to pull over by activating her flashing lights and began to follow the defendant.  Instead of pulling over, the defendant drove for about 200 yards and left the government property and did not come to a stop until about 1 block outside of the government property.)  Cf. the unpublished 4th Circuit opinion of U. S. v. Hamilton, 838 F.2d 1210(4th Cir (VA) 1988). (A case where within the government property boundary officers saw a man get out a truck on the driver's side walk unsteadily around the rear of the vehicle and climb into the passenger's seat,  saw a second man get out of the passengers seat and climb into the driver's seat and thereafter drive within the government property "weaving in and out of its lane."  After following the vehicle for sometime the officers pulled it over, both men smelled strongly of alcohol and had trouble standing. All occurring within the government property.)

2. Park Rangers are permitted to conduct investigations of offenses against the United States actually committed within the park upon a showing of the absence of investigation of these offenses by any other Federal Law Enforcement Agency having investigative jurisdiction over the offense committed in the park, a showing not made in this case. 16 U.S.C. § 1a-6(b)(3).

3. Before the Park Rangers were authorized to conduct an investigation of the alleged offenses, there had to be reasonable suspicion that those offenses occurred within the park. And the most that could occur outside the park even with reasonable suspicion of offenses having occurred within the park is an investigative stop and not an arrest. United States v. Smith, 713 F.2d 491, 493 (C.A. 9(CAL)(1983).

4. Weaving and passing traffic on a four lane highway without weaving in your single lane or weaving erratically or dangerously is not reasonable suspicion upon which a traffic stop may constitutionally be based.  In Virginia it takes evidence of an Officer observing a vehicle for 25 seconds "weaving repeatedly" within its lane between five and ten times over a distance of a ½ mile to produce a reasonable and

articulable suspicion to stop a vehicle and investigate further. Neal v. Comm., 498 S.E.2d 422, 425, 27 Va. App. 233(Va. App.1998). And in Tennessee, the location of Route 25 E. South, articulable reasonable suspicion authorizing a stop must include a "pronounced weaving or hard swerving" a "weaving that was either exaggerated or pronounced," a vehicle exhibiting "sharp or jerking movement,". State v. Gonzalo Moran Garcia, No. M2000-01760-SC-R11-CD(Tenn.10/1/2003)(TENN.,2003).

5. Where the Officers have no articulable reasonable suspicion sufficient to stop the defendant, the evidence discovered at the stop must be suppressed where (1) the period of time between the stop and collecting the evidence is short and (2) where there are no intervening circumstances which would allow the taint of the wrongful stop to dissipate (3) where the officer follows up the stop with other inappropriate and/or illegal conduct. And it is for the Government to prove that the evidence should be admissible in spite of the illegal stop.  State V. Gonzalo Moran Garcia, No.M2000-01760-SC-R11-CD Tenn.10/1/2003)(Tenn., 2003).

6. And under no circumstances is an arrest outside of park property or the evidentiary fruits of that arrest admissible as evidence unless the government proves that the person to be arrested is fleeing from the park with the specific purpose of avoiding arrest. 16 U. S. C. § 1a-6 (b)(1).

7. A person who drives in the state of Tennessee is deemed to have given consent for a breath test provided the test is administered at the direction of a Tennessee Law Enforcement Officer having reasonable grounds to believe that the person being tested was driving under the influence. The Law Enforcement Officer must be a duly elected or appointed officer of the state of Tennessee or any county or municipal subdivision thereof charged with conservation of the peace. Tennessee Code Section 55-10-405(2) and Tennessee Code Section 55-10-406(a)(1).

8. In Kentucky administration of both a preliminary breath test and the breath alcohol test requires that the person tested shall have operated a motor vehicle within the state of Kentucky. There is no Kentucky statutory authority for (i.e. no jurisdiction) a Kentucky Law

      Enforcement Officer to conduct either a preliminary breath test or a breath alcohol test (like the one conducted by the Middlesboro Police Officer in this case) when the person being tested was not operating or in physical control of a motor vehicle in the Commonwealth of Kentucky. Kentucky Revised Statutes 189A.100(1) and 189A.103 (the opening sentence and sub section(3).)

9. Moreover in Kentucky the testimony of the breath machine operator is admissible as to the certification and reliability of the machine so long as "the service records of the machine and the test ticket produced at the time of the test, are properly admitted." Commonwealth v. Roberts, Nos. 2002-SC-0691-DG-2002-SC-0326-DG, Supreme Court of Kentucky, (December 18, 2003).

10. The Court must exclude every reasonable hypothesis except guilt.

### IV. Argument

Justin Jones should be acquitted of the charges against him for these reasons:

1. There was no articulable reasonable suspicion and there is no proof beyond a reasonable doubt that Justin Jones was speeding 60 m.p.h. within the park boundary. There is a reasonable doubt that Chartier was driving. There is a reasonable doubt that, not driving, Chartier would have been able to see the Ranger vehicle's speedometer. There is no evidence or at least an overwhelming reasonable doubt that Chartier paced Justin Jones going 60 m.p.h. within the park boundary. Without pacing Justin Jones at 60 m.p.h. <u>within the park boundary</u> Justin Jones was not committing a Federal offense within the park boundary. If Justin Jones was committing the offense of speeding at 60 m.p.h. within the park boundary Chartier and his fellow ranger would have pulled over Justin Jones within the park boundary and not waited at least a ½ mile outside the park boundary to even turn on the blue lights.

2. There was no articulable reasonable suspicion to stop Justin Jones for an offense of DUI committed within the park boundary. The Government evidence was of weaving in the process of passing two vehicles. The only clear evidence of where the passing took place was

the passing of the two vehicles by Justin Jones after Justin Jones had gone under the walkway bridge.  It was after passing the two vehicles which occurred after the walkway bridge that the Park Rangers turned on the blue lights to which Justin Jones responded immediately and turned off the road into the LMU entrance.  This places the turning on of the blue lights more than likely within the last 1/10 of a mile between the walkway and the entrance to LMU (with there being 3/10 of a mile between those two points).  Justin Jones submits that the correct scenario of events is that the Park Rangers with unarticulable suspicions followed the Justin Jones vehicle down around the exit ramp(off Route 58) and onto 25 E. South and then another ½ mile outside the park. Then passing under the walkway, the Rangers saw the Justin Jones vehicle pass two vehicles at which pont the officers considered that he was weaving at which point they turned on their blue lights and thereafter in short order made their stop.  If Justin Jones had been speeding and weaving erratically and in a pronounced fashion, exhibiting a sharp or jerking movement within his own lane of travel along the roadway within the park, the officers would have certainly pulled Justin Jones over within what they consider to be the geographical boundary of the park and not have waited for another ½

mile before turning on the blue lights.  And there being no evidence from the Government of pronounced weaving or hard swerving or exaggerated or pronounced weaving or sharp or jerking movements by the Justin Jones vehicle there just was no reasonable suspicion and the stop should not have occurred much less the arrest.

3. This is not the case of U.S. v. Clifford Hall, (decision of Magistrate Judge Pamela Meade Sargent, April 5, 2005) where the evidence of the offenses occurring within the park(specifically within the Tunnel on the Park) was undisputed. In Hall there was video evidence, there was specific information from the Tunnel authority, all evidence generated on the park property.  In Hall the Court made it clear that evidence gathered subsequent to Hall's arrest was inconsequential because that evidence was not necessary to convict Mr. Hall of the offenses as to which there was overwhelming evidence gathered on park property and present <u>before the arrest</u>. ( See Hall at page 8) There was no investigative stop in the Hall case.

4. It is undisputed that Officer Chartier told Justin Jones at the Middlesboro Kentucky Police Department Office he had  passed the

field sobriety test with the exception of the preliminary breath test. In Virginia the results of the preliminary breath analysis are not admissible in evidence. Virginia Code Title 18.2-267 (E). The preliminary breath test was taken in Tennessee and there appears to be no provision for the preliminary analysis of breath under the Tennessee code.

5. Moreover the preliminary breath test and the later breathalyzer test are inadmissable because the stop and the arrest occurred outside the boundary of the Park in the state of Tennessee. Under Tennessee a person who drives a motor vehicle in Tennessee law is deemed to have given consent to a test for the purpose of determining the alcoholic content of his blood provided that the test is administered at the direction of a law enforcement officer having reasonable grounds to believe that such person was driving while under the influence of alcohol. Tennessee Code Section 55-10-406(a)(1). The test must be administered by a "law enforcement officer" and that is a person who is an elected or appointed officer of the state of Tennessee or any county or sub division of Tennessee charged with the enforcement of Conservation of the Peace. Tennessee Code Section 55-10-405(2). In this case the preliminary breath test was not administered at the

direction of a Tennessee Law Enforcement Officer. The later breath test in Middlesboro Kentucky was neither administered by a Tennessee Law Enforcement Officer nor by a person with reasonable grounds to believe that Justin Jones was driving while under the influence of alcohol.

6. The stop and the arrest having occurred in Tennessee, and the alleged speeding and weaving having occurred in the state of Tennessee, it was the state of Tennessee that had the jurisdiction for a stop and an arrest based on alleged speeding and DUI in the state of Tennessee. There being no claim that Justin Jones was driving in the state of Kentucky, the Middlesboro Police Officer had no jurisdiction, right or authority to be conducting a breath test on a person who was not driving his vehicle in the state of Kentucky at the time of the alleged DUI offense. See Kentucky Revised Statutes at sections 189A.100(1) and 189A.103(first sentence and subsection (3) and 189A-010). And even if Justin Jones was driving in the state of Kentucky the breath test results introduced by the government by the Middlesboro Kentucky Police Officer are not admissible because the police officer admitted that though he had seen the service records of the machine and the

       test ticket produced at the time of the test he did not have it with him, the documents with him to introduce at trial. Without those documents the certificate was not admissible. Commonwealth v. Roberts, Nos. 2002-SC-0691-DG,2002-SC-0326-DG. Supreme Court of Kentucky,(December 18,2003) at page 7.

7.    Simply stated, the stop and the arrest were illegal. If the Park Rangers had a suspicion that Justin Jones was driving in the state of Tennessee either over the speed limit or under the influence all they had to do was call ahead to the Harrogate Tennessee Police department, alert them to the situation and let them handle it. Instead two over zealous U. S. Government Park Rangers followed Justin Jones not 20 feet out of the park, not 100 feet, not 200 feet, but over 2,640 feet, over a ½ mile outside the park clearly in the state of Tennessee, all the way to LMU before even putting on their blue lights much less coming up behind Justin Jones.

       For all of which reasons Justin Jones moves to the Court to acquit him of the charges against him.

KEULING-STOUT, P.C.
125 Clinton Avenue East
P. O. Box 400
Big Stone Gap, Virginia 24219
Tel:   276-523-1676
Fax:   276-523-1608
Virginia State Bar No. 15289


By: s/ Henry S. Keuling-Stout


## CERTIFICATE OF SERVICE


I,   Henry S. Keuling-Stout, do hereby that I have on October 28,2005 **electronically filed** the **BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO ACQUIT**  with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:


JOHN L. BROWNLEE
United States Attorney


Zachary T. Lee, VSB 47087
Special Assistant United States Attorney
180 West Main Street
Abingdon, Virginia 24210

s/Henry Keuling-Stout

C:\WORKING DOCS\2082\01\009.Memorandum.wpd